IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

EJS Properties, LLC,                         Case No: 3:04CV7312

        Plaintiff,

    v.                                     ORDER

City of Toledo, et. al.,

        Defendants.


This is a civil action related to a government corruption scandal in the City of Toledo. The first complaint in the case, filed on May 25, 2004, arose out of the Toledo City Council's ["the Council"] decision not to rezone a plot of land in East Toledo. In July, 2002, a majority of the members of the Council, while serving on the Council's Zoning and Planning Committee ["the Committee"], approved the plaintiff's request to rezone the property. The following month, the Council reversed that decision. Events occurring between the Committee's recommendation and the Council's reversal make up the lion's share of the complaint.

Plaintiff seeks leave to amend its complaint to add new claims under the Civil Rights Act, 42 U.S.C. § 1983, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 ["RICO"] [Doc.137]. I grant leave to amend with regard to the Civil Rights Act claim but deny the motion with regard the RICO claims.

1

**Factual Allegations**

In May, 2002, plaintiff EJS submitted a request that the Toledo City Council rezone a plot of land at 1701 East Broadway in East Toledo. EJS planned to purchase the property from Pilkington North America ["Pilkington"] and to then lease it to a charter school and several light industrial businesses. After the Toledo-Lucas County Plan Commission reviewed the project, it recommended the Committee approve EJS's proposal.[1]

Councilman Robert McCloskey was initially one of the EJS project's champions. But in the weeks between the Committee's approval and the Council's vote, McCloskey did more than change his position. On August 2, 2002 he contacted two Pilkington Executives, John Kiel and Randall Berg, and demanded $100,000 in return for his vote.[2] If Kiel and Berg did not pay, McCloskey promised to change his vote and get other members of the Council to follow suit. When Kiel and Berg relayed this information to Erich J. Speckin of EJS, Speckin contacted McCloskey. Rather than

---

[1]

The Charter of the City of Toledo authorizes the Plan Commission to hold public hearings and provide recommendations to the Toledo City Council for actions related to rezoning requests. The professional staff of the Plan Commission reviews and analyzes each rezoning request and recommends that the Plan Commission approve, reject, or modify the request. The Plan Commission then formally makes a recommendation to the City Council's Planning and Zoning Committee, which consists of a majority of members of the City Council. The Planning and Zoning Committee then reviews the request and related recommendations and votes to approve or reject the request. This decision is then submitted to the full City Council for formal adoption. Given the make-up of the Planning and Zoning Committee, its decision usually becomes the decision of the Council.

[2]

McCloskey did not intend to enrich himself directly with the money he was demanding. He was a former union official with a union representing Pilkington employees. He planned to use the money to help Pilkington retirees who had reached their annual prescription drug cap. According to the plaintiff, McCloskey had been involved in negotiating the contract between Pilkington and its employees; union members had expressed unhappiness about the contract's drug coverage, and they blamed McCloskey for the deficiency. In additional, McCloskey's constituents included many former Pilkington employees.

deny the allegation, McCloskey repeated the request and threat. He also offered to let Speckin pay the demanded money. Later in the week, McCloskey left a voicemail with Speckin covertly reminding him of the necessary payment.

When Speckin, Kiel, and Berg did not provide the requested payment, McCloskey lobbied fellow Council members to reverse their votes. This effort led to the eventual failure of the rezoning proposal on August 27, 2002. As a result, the agreement between EJS and Pilkington fell apart, allegedly causing the plaintiff substantial damages. Plaintiff claims that several Council members who reversed their votes knew of McCloskey's efforts to extract payment from the plaintiffs.

Several months later, in May, 2003, Toledo Public Schools acquired the property and the Council approved a rezoning proposal very similar to the EJS proposal.

In May, 2004, EJS brought suit against the City of Toledo and McCloskey. In its original complaint, EJS asserted four claims for relief under 42 U.S.C. § 1983, all based on violations of constitutional rights. These claims consisted of violations of substantive and procedural due process, equal protection, property rights, and other rights and privileges guaranteed under the Fifth and Fourteenth Amendments.

Expedited discovery took place in the Summer of 2004. Council members who were thereafter deposed in 2004 and 2005 testified that they "could not recall" any discussions regarding McCloskey's attempts to influence their votes in connection with the rezoning of the Pilkington property. Peter Ujvagi, Wilma Brown, and Tina Skeldon Wozniak were the three Council members who, in addition to McCloskey, reversed their votes between the Planning and Zoning Committee hearing on July 17, 2002 and the final Council vote on August 27, 2002.

3

Mr. Ujvagi and Ms. Wozniak both testified that they "did not recall" any conversations with McCloskey or the other Council members with regard to the EJS zoning issue. Ms. Brown only recalled a short conversation with McCloskey at the time of the rezoning request, but could not recall discussing anything significant.

Council members Wade Kapszukiewicz and Betty Shultz also testified that they "did not recall" any conversations with McCloskey or the other Council members with regard to the EJS zoning issue. McCloskey, asserting his right against self-incrimination under the Fifth Amendment, refused to testify about any such discussions.

The Lucas County Prosecutor's Office, through its Chief Investigator, Frank Stiles, began an investigation into whether the State should seek to indict McCloskey for bribery in connection with the matters giving rise to this litigation. Specifically, the prosecutor examined whether McCloskey committed bribery when he sought $100,000 from EJS and Pilkington in return for exerting his influence on the rezoning issue before the Council. The investigation led to a grand jury indictment and, ultimately, McCloskey's conviction on state charges.

Unbeknownst to EJS, the federal government also began an investigation of McCloskey and set up a sting operation in early 2006. In March, 2006, McCloskey and a Toledo businessman discussed McCloskey using his influence with the Council to ensure that the businessman was the successful purchaser of land owned by the City of Toledo. After receiving numerous assurances from McCloskey regarding the purchase, the Toledo businessman handed McCloskey $3,000 in cash. They agreed to tell no one of the payment. In April, 2006, the businessman met with McCloskey and provided him with an additional $2,000. In return, McCloskey promised to assist the businessman with a rezoning proposal.

4

The federal grand jury charged McCloskey with two federal bribery charges under the Hobbs Act, 18 U.S.C. § 1951. McCloskey pled guilty in May, 2006 to these charges.[3]

The criminal proceedings provided EJS with a broader perspective on McCloskey's activities. After I lifted the stay, discovery resumed. The results of the Lucas County criminal investigation disclosed, contrary to the deposition testimony taken in 2004 and 2005, that Council President Peter Ujvagi and Council members Tina Skeldon Wozniak, Wilma Brown, and Wade Kapszukiewicz, were all aware of the McCloskey bribe solicitation in connection with the Pilkington matter before the August 27, 2002 vote.

On August 14, 2007, EJS moved to amend its complaint to add a new Civil Rights Act claim and two RICO claims [Doc. 137]. Mistakenly believing that the motion was unopposed, I initially granted the motion on September 21, 2007 [Doc. 154]. I vacated that order to give defendants additional time to file opposition briefs [Doc. 157].

## Discussion

### A. Standard for Leave to Amend

Leave to amend a complaint "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). In making such an assessment, the court should consider "undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005). Ultimately, however,

---

[3]

While the criminal investigations were proceeding, I stayed all discovery in this civil action [Doc. 112].

5

"the grant or denial of an opportunity to amend is within the discretion of the District Court." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

### B. Civil Rights Claim

Defendants assert that the court should deny EJS's motion to amend to add an additional claim under 42 U.S.C. § 1983 because the new claim is time-barred and, therefore, futile.

Both Toledo and McCloskey assert that the amendment to include a new civil rights claim should fail because EJS requested leave to amend after expiration of the two-year limitations period for § 1983 claims.[4] While leave to amend is to be "freely given" when justice requires, a court may deny a such a request when a claim is futile because it cannot withstand a motion to dismiss. Fed. R. Civ. P. 15(a); *see also, e.g.*, *Kottmyer v. Maas*, 436 F.3d 684, 692 (6th Cir. 2006) ("A district court may deny a plaintiff leave to amend his or her complaint  .  .  .  when the proposed amendment would be futile."); *Miller v. Calhoun County*, 408 F.3d 803, 817 (6th Cir. 2005) ("Amendment of a complaint is futile when the proposed amendment would not permit the complaint to survive a motion to dismiss.").

A newly asserted claim is not futile, however, if it arises out of the same "conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2); *Mayle v. Felix*, 545 U.S. 644, 655 (2005); *Tiller v. Atl. Coast Line R. Co.*, 323 U.S. 574, 581 (1945). When this occurs, Rule 15 of the Federal Rules of Civil Procedure instructs that the

---

[4] Statutes of limitations for § 1983 actions are borrowed from state law. *Wilson v. Garcia*, 471 U.S. 261, 275 (1985). The applicable Ohio statute imposes a two year limitations period. *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516, 519 (6th Cir. 1997).

amended complaint "relates back to the date of the original pleading."[5] Fed. R. Civ. P. 15(c). In this case, the "original pleading" is the complaint. *Mayle*, *supra*, 545 U.S. at 655 ("The 'original pleading' to which Rule 15 refers is the complaint in an ordinary civil case, and the petition in a habeas proceeding.").

The Sixth Circuit has held that the scope of "conduct, transaction, or occurrence" is determined by "asking whether the party asserting the statute of limitations defense had been placed on notice that he could be called to answer for the allegations in the amended pleading." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 516 (6th Cir. 2007). The court must liberally interpret Rule 15(c)(2). *Id.* ("The Rule also must be interpreted in light of the 'fundamental tenor of the Rules,' which 'is one of liberality rather than technicality.'") (quoting *Miller v. Am. Heavy Lift Shipping*, 231 F.3d 242, 248 (6th Cir.2000)).[6]

---

[5]

Toledo asserts that Rule 15(c)(1) is controlling. Rule 15(c) allows an amended pleading to relate back to the date of the original pleading when "relation back is permitted by the law that provides the statute of limitations applicable to the action," Fed. R. Civ. P. 15(c)(1), or "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). I decide this case under Fed. R. Civ. P. 15(c)(2).

[6]

The same conduct, transaction, or occurrence test is generally satisfied if the amended complaint alleges the same "general set of facts" as the original complaint. *Miller v. Am. Heavy Lift Shipping*, 231 F.3d 242, 249-50 (6th Cir. 2000) (holding that though the claims involved new "operative facts," the amendment satisfied the 15(c)(2) standard because it alleged the same "general set of facts"). The standard will not be met if the facts necessary to support the amended complaint were completely absent from the original complaint. *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 519 (6th Cir. 2007) (holding that the amended claims did *not* arise from the same conduct, transaction, or occurrence because nothing in the original complaint, the first amended complaint, or the plaintiff's disclosure statement addressed the violations alleged in the new claims).

7

EJS's proposed fifth claim arises from its allegation that defendants impeded its "right of access to petition the government by ratifying, facilitating and endorsing the Extraction Payment . . . in exchange for *pro forma* approval of the July 17, 2002 approval" of the plaintiff's zoning request. [Doc. 137-1, ¶ 171]. EJS's first four claims are for various injuries also arising from the Council's reversal of the Committee's July 17, 2002 favorable decision.

Defendants effectively concede that the new claim arises from the same conduct as the timely § 1983 claims. In arguing that the claim is time-barred, both Toledo and McCloskey note the statute of limitations for all the § 1983 claims began to run on August 27, 2002, the date of the final Council vote. Thus, Toledo and McCloskey point to the same specific point of origin for both the initial and new § 1983 claims.

The fact remains that the original complaint placed defendants on notice that they could be called on to answer the §1983 allegations in the amended pleading. Toledo concedes that the facts on which the additional claim is based are not new. Because EJS asserted four similar § 1983 claims in the original complaint, defendants had adequate notice and are not prejudiced by allowing the amendment. Thus, the Rule 15(c)(2) standard is met and the new claim will relate back to the date of the original complaint. Because the claim is not time-barred, it is not futile.[7]

## C. RICO Claims

The defendants assert that I should deny that part of EJS's motion which seeks to add RICO claims because these claims are untimely and therefore futile.

---

[7]

Toledo also argues that EJS's amendment is the result of "undue delay" because EJS waited until a month before the statute of limitations expired to file its original complaint. This argument is unfounded. EJS timely filed its first complaint and is properly amending it.

The RICO Act makes it unlawful "for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce" and "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. §§ 1962 (b), (c).

Congress enacted the RICO statute as a criminal-law weapon against organized crime. But Congress also authorized its use in the civil arena. 18 U.S.C. § 1964(c); *see Chivas Products Ltd. v. Owen*, 864 F.2d 1280, 1284 (6th Cir. 1988) ("The legislative history of RICO indicates clearly that the civil damages remedy of § 1964(c) was designed as an integral part of a broad-front attack on organized crime.").

The statute defines a racketeering activity as "'any act or threat involving,' specified state law crimes, any 'act' indictable under various specified federal statutes, and certain federal 'offenses,'" among them extortion and bribery. *H.J. Inc., v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232 (1989) (quoting 18 U.S.C. § 1861(1)). A "pattern" requires at least two racketeering activities in a ten-year period. 18 U.S.C. § 1961(5).

Federal courts have, however, generally been unenthusiastic about civil RICO suits. They have curbed RICO's impact by defining a "pattern of racketeering" in greater detail, *H.J. Inc.*, *supra*, 492 U.S. at 237-43, providing a limitation period for bringing civil actions, *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.*, 483 U.S. 143, 156-57 (1987) (applying the Clayton Act's four year statute of limitations to the RICO statute), and narrowing the circumstances in which a cause of

action arises. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 187-88 (1997) (rejecting contention that RICO limitations period begins anew with each new predicate act that is part of the alleged pattern of acts).

### 1. Injury Accrual and the Start of the Limitations Period

While the plaintiff and defendants agree that a four year limitations period governs civil RICO actions, they disagree as to when that period began to run. Defendant McCloskey, asserts that the Supreme Court's decision in *Rotella v. Woods*, 528 U.S. 549, 553-59 (2000) clarified the issue when it held that claims accrue when the plaintiff discovers or should have discovered his RICO injury, even if plaintiff is unaware of defendant's involvement in the relevant pattern of racketeering activities. In contrast, EJS focuses on the questions that remained unanswered by the Court in *Rotella*, and asks me to find answers in the gaps that the decision in *Rotella* expressly failed to fill. *See Id.* at 554 n.2, 559 n.4.

McCloskey is correct in some respects. In *Rotella*, the Supreme Court rejected the pattern discovery rule, pointing out that "tying the start of the limitations period to a plaintiff's reasonable discovery of a pattern rather than to the point of injury or its reasonable discovery . . . would extend the potential limitations period for most civil RICO cases well beyond the time when a plaintiff's cause of action is complete." *Id*. at 558. In so holding, the Court appeared to endorse an injury discovery rule, starting the limitations period when a plaintiff discovered, or should have discovered, his or her injury. *Id.* at 553-54; *see also Klehr, supra*, 521 U.S. at 187-88 (rejecting the last predicate act rule, which allowed the limitations period to run anew each time the defendant committed an additional predicate act forming a part of the same RICO pattern).

10

The *Rotella* decision's footnotes highlight the numerous questions the Court chose not to answer. Among them are: whether injury *occurrence* alone could serve to start the limitation period, 528 U.S. at 554 n.2 (explaining the Court's "decision in *Klehr* leaves open the possibility of a straight injury occurrence rule"), and what happens when an injury precedes the formation of a pattern of racketeering. *Id.* at 559 n.4 ("[W]e need not and do not decide whether civil RICO allows for a cause of action when a second predicate act follows the injury, or what limitations accrual rule might apply in such a case.").

Since the Court refrained from applying an absolute rule, decisions in this circuit have been reticent about applying the injury discovery rule when the defendant's injury occurred *before* such injury became part of a "pattern of racketeering." Instead they have concluded that a claim only accrues when there is an injury *and* a pattern of racketeering. *See Bygrave v. Van Reken*, 238 F.3d 419 (Table), 2000 WL 1769587, at 3-5 (6th Cir. Nov. 14, 2000) (interpreting *Rotella* to require an injury and two predicate acts for a civil RICO claim to accrue); *Wozniak v. Corrigan*, 2006 WL 4512815, at *8 (N.D. Ohio May 12, 2006) (assuming, based on the facts of the case, that the limitations clock would begin to run at the time of the second predicate act, several years after the plaintiffs' alleged injury); *see also Lares Group, II v. Tobin*, 221 F.3d 41, 45 (1st Cir. 2000) (holding that plaintiff's claim accrued on injury but "leaving open the possibility that a different accrual rule may apply where a plaintiff's injury does not complete her cause of action"); *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992) ("There must, of course, be a pattern of racketeering before the plaintiff's RICO claim accrues, and this requirement might delay accrual until after the plaintiff discovers her injury."). I agree with these decisions: even if a plaintiff did or should have discovered the injury in question, the RICO limitations period did not begin to run until there was a pattern of

11

racketeering. *See Rotella*, *supra*, 528 U.S. at 559 n.4 (pointing out "that when the injury precedes the second predicate act," an alternative interpretation could lead to the "limitations period . . . expir[ing] before the pattern is created").

## 2. McCloskey's Predicate Acts

Interpreting the facts underlying EJS's complaint, McCloskey asserts that Speckin was aware of the plaintiff's injury and at least five predicate acts constituting a "pattern of racketeering" by August 27, 2002. If this were the case, the limitations period would time-bar EJS's RICO claim.

The defendant, however, misinterprets the meaning of "pattern of racketeering activity." 18 U.S.C. §§ 1962 (a), (c). In *H.J. Inc.*, *supra*, 492 U.S. at 239, the Supreme Court explained that "RICO's legislative history reveals Congress' intent that to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related *and* that they amount to or pose a threat of continued criminal activity." Though the Court rejected the multiple scheme test – which held that single fraudulent effort was not enough to constitute a pattern – it did require a plaintiff prove "the continuity of the racketeering activity, or its threat *simpliciter*." *Id.* at 240-41.

A plaintiff can meet this burden by "proving a series of related predicates extending over a substantial period of time." *Id.* at 242. Though somewhat abstract, this standard would be met where a party shows "that the predicates are a regular way of conducting defendant's ongoing legitimate business" but not where predicate acts merely extend "over a few weeks or months and threaten[] no future criminal conduct." *Id.* at 242-43; *see also Columbia Natural Res., Inc. v. Tatum*, 58 F. 3d 1101, 1110 (6th Cir. 1995) (simplifying the inquiry into a series of factors including: length of time the racketeering activity existed; number of schemes; different types of predicate acts; distinct injuries; number of victims; and number of perpetrators).

12

The parties in this case provide examples of a pattern of racketeering that illustrate this distinction. McCloskey asserts that the bribe request to Keil and Berg, the bribe request to Speckin, and the voicemail McCloskey left with Speckin all constitute predicate acts in a pattern of racketeering. While these are separate actions, their temporal proximity and connection to a singular criminal scheme show that they do not alone constitute the requisite pattern. In contrast, EJS points to McCloskey's attempt to extort money from it in relation the zoning ordinance, in combination with McCloskey's efforts to extort bribes from citizens who had interests in other matters coming before the Council. These acts, examined together, provide evidence of "a series of related predicates extending over a substantial period of time." *H.J. Inc., supra*, 492 U.S. at 242.

EJS, however, is incorrect in its assumption that its awareness of the pattern of racketeering activity has any bearing on when its RICO claim accrued. As previously explained, it is the point at which the plaintiff becomes or should become aware of the injury – in combination with the existence of a pattern of racketeering – that defines when a RICO claim accrues. Despite its alleged lack of knowledge of the pattern before the revelations via the U.S. Attorney's prosecution of McCloskey, EJS makes several points indicating that a pattern existed at the time of its injury in 2002 and well before August 15, 2003.

Thus, in one of its briefs, EJS notes that "in late 2002 or early 2003" McCloskey gave Councilman Wade Kapszukiewicz an envelope containing "an apparent contribution on behalf of strip club owners who were trying to water down [Kapszukiewicz's] ordinance restricting sexually oriented businesses." (Pl.'s Reply in Supp. of its Mot. for Leave to Am. [Doc. 170], Oct. 11, 2007, at 8 (quoting *McCloskey Complaint Resurfaces*, Toledo Blade, May 7, 2006).) In its amended complaint, the plaintiff makes similar allegations, noting that in 2003 McCloskey questioned why

13

he should support a constituent's opposition to the citywide smoking ban when that constituent had "never crossed [McCloskey's] palm with one dime" and that "[v]arious members of City Council were aware that McCloskey kept a separate bank account at Key Bank in the name of other individual or entity [sic] into which he would place contributions for various activities all in violation of Ohio law." (Pl.'s Mot. for Leave to File First Am. Compl. [Doc. 137-1], August 14, 2007, at ¶¶ 126-27.)

These allegations show that a pattern of racketeering existed before and during the time of the plaintiff's injury. Because EJS had knowledge of its injury in August, 2002, and the alleged RICO scheme existed when EJS obtained this knowledge, the limitations period established in *Malley-Duff & Assoc., Inc.*, *supra*, 483 U.S. at 156-57 bars EJS's RICO claims. As a result, the motion to amend with regard to the RICO claims is denied as futile.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT

1. Plaintiff's motion to amend its complaint to add claims under 42 U.S.C. § 1983 be, and the same hereby is granted; and

2. Plaintiff's motion to amend its complaint in order to add claims under 18 U.S.C. § 1962 be, and the same hereby is denied.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge

14