IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

EJS Properties, LLC,                                    Case No. 3:04CV7312

        Plaintiff,

    v.                                                 ORDER

City of Toledo, et al.,

        Defendants.

This is a civil rights case in which plaintiff, EJS Properties, LLC [EJS] raises claims under

42 U.S.C. § 1983 and Ohio state law against defendants City of Toledo, and former Toledo City

Councilman Robert McCloskey. EJS alleges defendant McCloskey improperly sought $100,000

from Pilkington, N.A. [Pilkington] and EJS in exchange for Council's approval of a proposed re-

zoning ordinance. EJS alleges McCloskey and the City Council defeated its ordinance because of

its refusal to acquiesce to McCloskey's demand, and EJS suffered damages as a result.

1

EJS asserts under § 1983 that  defendants violated its rights to substantive and procedural due process, equal protection and to petition the government for redress of grievances. It also brings a state law claim against defendants for wrongful interference with business expectancy.[1]

Pending are defendants' motions for summary judgment [Docs. 219, 221]. Jurisdiction exists under 28 U.S.C. § 1331 and  § 1367. For the following reasons I grant summary judgment to defendants City of Toledo and Robert McCloskey on all § 1983 claims. I grant summary judgment to defendant City of Toledo on EJS' claim for tortious interference of business relationships, but deny summary judgment to defendant McCloskey on this claim.

### Background

On April 3, 2002, EJS and Pilkington Corporation entered into an Offer to Purchase, whereby plaintiff EJS would acquire about fifteen acres of a forty-three acre parcel owned by Pilkington, and located at 1701 East Broadway, Toledo. The premises covered by the Offer to Purchase included a building formerly used by Pilkington as a technical center. The Offer to Purchase was contingent on re-zoning to permit use of the building by a charter school. EJS intended to enter into a lease agreement with Lake Erie Academy, a charter school, after obtaining approval for re-zoning and concluding its purchase of the property.

---

[1] EJS argues defendants have tried to misstate EJS' state law claim, and that it does not need to show that defendants acted intentionally. McCloskey notes that Missouri and Michigan recognize the tort of "wrongful interference with business expectancy," but Ohio does not. EJS fails to provide a case recognizing this tort or identifying and discussing its elements and I can find none. I therefore analyze it as a claim for "tortious interference with a business relationship." *See, e.g., Dolan v. Glouster*, 173 Ohio App. 3d 617, 629 (2007) ("The elements of tortious interference with a business relationship are 1) a business relationship; 2) the tortfeasor's knowledge thereof; 3) an intentional interference causing a breach or termination of the relationship; and 4) damages resulting therefrom .  .  . It includes intentional interference with prospective contractual relations not yet reduced to a contract.").

In May, 2002, EJS filed a petition with the Toledo-Lucas County Plan Commission seeking a zoning change from the classification M-2 (industrial district) to C-2 (restricted office). The Plan Commission staff recommended that the Commission approve the zoning request only if the designation was changed from an M-2 to an M-3 (planned industrial district), rather than C-2 classification.

EJS accepted the M-3 recommendation. On June 13, 2002, the Plan Commission held a public hearing for the re-zoning request. The Commission recommended re-zoning the site to M-3. It submitted EJS's request to the Zoning and Planning Committee of the Toledo City Council for review.

On July 17, 2002, the Zoning and Planning Committee held a public hearing on the re-zoning request. It voted 7 - 0 to recommend approval of the proposed re-zoning. Incorporated into ordinance form as Ordinance 643-02, the recommendation was set for consideration at the August 13, 2002, meeting of Toledo City Council.

Sometime during the second half of July, 2002, McCloskey attended a lunch with John Keil, Director of Environmental Health, Safety and Property for Pilkington, and Randy Berg, a negotiator on behalf of management for Pilkington. McCloskey formerly worked at Pilkington, and, as a union negotiator, had helped negotiate a labor agreement that capped the healthcare benefits received by Pilkington retirees.

According to Keil and Berg, McCloskey asked Pilkington to contribute $ 100,000 to the East Toledo Retirees' Center, to assist Pilkington retirees with health insurance and/or drug prescription issues, or, according to Berg, for the East Toledo Community Center to buy busses to take retirees to Canada to purchase prescription drugs. Berg and Keil testified McCloskey used language

indicative of a *quid pro quo* agreement. According to Berg, McCloskey stated that, "He needed something to continue to support . . . re-zoning" and that if Pilkington did not accede to his demand, he would defeat the re-zoning. Keil said McCloskey presented the $100,000 as "a condition to EJS receiving approval for the re-zoning application" and that McCloskey said that "he would be able to see that [the re-zoning application] was voted down." [Doc. 75]. Pilkington declined to make any contribution to a retirees' fund.

Following that lunch, Keil informed Erich Speckin, owner of EJS, of McCloskey's position. Speckin called McCloskey, who told Speckin "he thought Pilkington needed to give something back to the community to make this project go forward, and without that, he wasn't going to vote in favor of it anymore, and that was his position."[Doc. 68].

After this lunch, McCloskey left voicemail messages for Keil, Berg and Speckin seeking a monetary contribution to the retirees' fund in connection with the pending re-zoning ordinance.[2]

On August 13, 2002, EJS' re-zoning ordinance came before Toledo City Council for a vote. Councilman Peter Gerken moved to delay the vote on the ordinance for two weeks. According to Gerken, he sought the delay to obtain more information about the development of an industrial corridor and the availability of another industrial parcel, owned by Unitcast, located near the Pilkington East Broadway site.

On August 20, 2002, members of City Council reviewed the ordinance at their bi-weekly Agency Review meeting. Robert Williams, an assistant chief operating officer for the City, attended the meeting to communicate Mayor Jack Ford's position on the re-zoning ordinance for 1701 East

---

[2] McCloskey subsequently plead guilty to federal and state corruption indictments.

Broadway. According to Williams, the Mayor wanted the site preserved for future industrial and commercial use. Nine council members, including McCloskey, attended this meeting.

On August 22, 2002, John Keil of Pilkington sent a letter to all members of Toledo City Council, with a copy sent to the Clerk of Council, Michael Beazley. The letter was also sent to Mayor Ford, and a copy sent to assistant Chief Operating Officer, John Loftus. In that letter, Keil sought support for EJS' request and advised that "[c]onsideration should also be given to unrelated issues that may exist between [Pilkington and McCloskey]. Such issues have the potential for exploitation to the detriment of the zoning request." [Doc. 247, Exh. 11].

On August 27, 2002, Ordinance 643-02, EJS' re-zoning request, came before the Toledo City Council for approval or rejection. The City Council denied EJS' re-zoning request by a vote of 7-4, with Councilman Escobar absent.

Then-President Peter Ujvagi, Tina Skeldon-Wozniak, Wade Kapszukiewicz, Michael Ashford, Wilma Brown, Peter Gerken and Robert McCloskey voted against the ordinance. Gene Zmuda, Betty Schultz, Rob Ludeman and George Sarantou voted in favor of the ordinance. Louis Escobar was absent at the time of the vote.

Four of the council members who voted against the ordinance changed their vote between the July 17, 2002, meeting of the Zoning and Planning Committee, at which all seven Council members in attendance had voted to recommend adoption of the ordinance: Peter Ujvagi, Tina Skeldon-Wozniak, Wilma Brown and McCloskey.

On this same date, the City Council introduced legislation authorizing the expenditure of $50,000 for the purchase of two parcels adjacent to the Unitcast property at 1414 East Broadway to continue the development of the industrial roadway corridor.

5

EJS contends, *inter alia*, that McCloskey, as the Council representative from the district to be affected by the proposed re-zoning, was in a position to influence the votes of the members from other districts and the at-large members. This was so, according to EJS, because, as a matter of general custom, members acceded to the desires of the district representative regarding issues related to economic development within the particular district.

During pretrial discovery counsel for EJS deposed the Council members who participated in the August 27, 2002, meeting at which Council rejected the re-zoning ordinance.

Councilperson Wilma Brown, who changed her vote, testified that she followed McCloskey's lead. According to Brown, McCloskey indicated to her that he would vote against the re-zoning ordinance because he thought it appropriate to preserve the land for industrial use. Brown maintained she would only follow his lead if she agreed with him.

Councilpersons Ashford and Kapszukiewicz also testified that, while they had no independent recollection, it was possible that they had some conversations with McCloskey about his position on the re-zoning request. They agreed that a district councilperson's opposition to a zoning request was a factor to consider. Councilperson Ashford testified that he "probably would have" asked McCloskey. [Doc. 77]. Kapszukiewicz described a district councilperson's position a "very important thing" or "consideration" and believed other councilpersons shared his view. [Doc. 81].

Councilperson Gerken testified he had no recollection of whether he talked to McCloskey or not, but conceded that it was possible he did, and that council representatives consult with a district council representative on zoning matters impacting the representative's district.

John Stout, a charter school representative, stated he participated in a conversation with Councilperson Zmuda during which they and others discussed "McCloskey's request for monies." [Doc. 104, Att. 1]. According to Stout, Councilperson Zmuda knew about McCloskey's request for money and indicated other City Council members knew as well. Councilperson Wozniak stated that she did not recall why she reversed her vote, but testified that she knew what McCloskey wanted. She also recalled speaking with McCloskey, but not the specific details.

Councilperson Ujvagi stated that he did not speak with McCloskey because he had a strained relationship with him, and never spoke with him outside of council meetings. He did, however, agree that council members discuss their votes and that council members take a district councilperson's wishes into account.

After John Keil received McCloskey's voicemail, he contacted John Loftus, the Assistant Chief Operating Officer to Mayor Jack Ford, and told him that McCloskey had demanded money for the re-zoning. Loftus told Mike Beazley, Clerk of City Council.

Keil also contacted Councilperson Zmuda, who indicated to Keil that it was the general understanding of City Council that McCloskey had made the $100,000 demand of Pilkington.

Councilperson Louis Escobar testified that other council members "knew that McCloskey had, in fact, requested this money of Pilkington and was not getting it and that's why [McCloskey] was changing his vote." [Doc. 247].

On August 28, 2002, the day after the Council vote denying the re-zoning, the *Toledo Blade* reported on the vote, stating:

> The rezoning was recommended 7-0 by council's planning and zoning committee July 17. Among the supporters then was District 3 Councilman Robert McCloskey. But McCloskey changed his mind a few weeks later. He said he decided that the property should remain available for industrial use.

7

A retired LOF employee, McCloskey said he had no love for Pilkington.

He claimed the company reneged on a deal he had helped negotiate to pay for retirees' prescriptions above $2000. He acknowledged that he changed his mind about the zoning matter after he'd approached Pilkington about making good on the prescription commitment with no success.

He said he is not personally affected because he receives health coverage through the city. "I have a little bit of revenge in my stomach," McCloskey said.

[Doc. 247, Exh. 12].

The *Blade* had reported a week earlier that:

The rezoning was approved 7-0 by council's zoning and planning committee, but ran into trouble when East Toledo District Councilman Bob McCloskey said he had changed his mind and would oppose the rezoning.

[Doc. 247, Exh. 13].

Because of the denial of EJS' re-zoning ordinance, EJS did not purchase the Pilkington property. It was thus unable to honor its lease agreement with the charter school for part of the technical center. EJS also was unable to lease other portions of the building to prospective lessees. EJS claims economic losses of several million dollars.

In November, 2002, Toledo voters passed a Toledo Public School [TPS] levy, which mandated building two middle schools in East Toledo,[3] where the Pilkington property is located. TPS initiated an eminent domain lawsuit against Pilkington for the entire 1701 East Broadway site. In November, 2003, a judge of the Lucas County, Ohio, Court of Common Pleas entered a judgment in favor of TPS, finding "necessity" for its taking of the property. TPS became the fee simple owner of the  property. Following the proceeding, TPS applied to the Toledo-Lucas County Plan

―――――――――――――

[3] "East Toledo" is part of the City of Toledo, not a separate municipal or governmental entity.

8

Commission to re-zone the 1701 East Broadway property from the classification of M-2 to R-3 to permit construction of a middle school and use of the entire site as a campus.

The Plan Commission approved the TPS re-zoning application and forwarded the request to City Council's Zoning and Planning Committee, which voted on January 7, 2004, to recommend that Council approve the recommended re-zoning. On January 27, 2004, Council unanimously approved the rezoning request. TPS has since built the middle school and related recreational facilities.

At that time, McCloskey stated, "A few years ago, the charter school system came to council and we were looking at putting a charter school in that location. I strongly asked council to vote against the charter school." [Doc. 247, Exh. 15].

EJS brings § 1983 claims for 1) deprivation of substantive due process under the Fifth and Fourteenth Amendments; 2) deprivation of procedural due process under the Fifth and Fourteenth Amendments; 3) deprivation of equal protection under the Fifth and Fourteenth Amendments; 4) deprivation of property rights under the Fifth and Fourteenth Amendments; and 5) deprivation of its right under the First Amendment to unimpeded access to petition the government. EJS brings a state law claim against McCloskey and the City of Toledo for wrongful interference with business expectancy.

The City contends that it violated no constitutional rights, cannot be held liable for any violations, did not interfere with EJS' business expectancy and, in any event, has immunity from plaintiff's federal and state law claims. McCloskey argues that no constitutional violations against EJS took place, he did not interfere with EJS' business relationships and he is entitled to absolute and qualified immunity.

9

**Standard of Review**

I must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of informing the district court of its motion's basis, and identifying the record's portions demonstrating the absence of a genuine issue of material fact. *Id.* at 323. The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* Fed. R. Civ. P. 56(e)). The nonmoving party cannot rest on its pleadings or merely reassert its previous allegations; rather, the nonmovant must show that there is more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56(e) "requires the nonmoving party to go beyond the unverified pleadings" and present some type of concrete evidentiary material in its position's support. *Celotex, supra*, 477 U.S. at 324.

In deciding the motion for summary judgment, I accept the evidence of the nonmoving party as true, resolve all doubts against the nonmoving party, construe all evidence in the light most favorable to the nonmoving party, and draw all inferences in the nonmoving party's favor. *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451, 456 (1992). I shall rule in favor of summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue of material fact exists and the law entitles the movant to summary judgment.

**Discussion**

**I. § 1983 Claims**

10

### 1. Absolute Legislative Immunity

McCloskey asserts absolute legislative immunity in response to EJS' § 1983 claims. "Local legislators are .  .  . absolutely immune from suit under § 1983 for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 48-49 (1988).  "Whether an activity is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id*. at 54.

Zoning is ordinarily a legislative activity for purposes of absolute immunity. Zoning is administrative if the action singles out specific individuals and affect[s] them differently from others. *Haskell v. Washington Twp.*, 864 F.2d 1266, 1278 (6th Cir. 1988). "Absolute immunity does not extend to even traditional acts of local legislators if the acts were taken on either bad faith, because of corruption, or primarily in furtherance of personal instead of public interests." *Id.*

EJS alleges McCloskey sought $100,000 from Pilkington to benefit the East Toledo retirees in exchange for passage of the re-zoning ordinance. It has submitted evidence that McCloskey acted in bad faith, corruptly and primarily in furtherance of his own personal, rather than the public interests. McCloskey thus is not entitled to absolute legislative immunity. *See, e.g, Haskell, supra*, 864 F.2d at 1278 (finding trustees were not entitled to absolute legislative immunity because plaintiff presented enough evidence for inference that individual city trustees enacted zoning ordinances to carry out their personal interests).

### 2. Qualified Immunity

McCloskey asserts qualified immunity in response to plaintiff's § 1983 claims. A successful assertion of qualified immunity enables defendants in § 1983 cases to avoid standing trial or enduring the other burdens of litigation. *Harrison v. Ash*, 539 F.3d 510, 514 (6th Cir. 2008).

To determine whether to grant summary judgment on the basis of qualified immunity, I consider: 1) whether, after viewing facts in the light most favorable to the plaintiff, the plaintiff has shown that defendant's conduct violated plaintiff's constitutional or statutory rights, and 2) whether those rights were clearly established at the time of the alleged violation. *See, e.g., Phillips v. Roane County, Tenn.*, 534 F.3d 531, 538-39 (6th Cir.2008); *Curry ex rel. Curry v. Hensiner*, 513 F.3d 570, 576 (6th Cir.2008).[4]

The Sixth Circuit sometimes adds a third inquiry: namely, "whether plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights." *Id*. "The third inquiry impacts the analysis when *despite* the violation of a clearly established constitutional right, the official's conduct was objectively reasonable, and so should still enjoy qualified immunity." *Id*.

## A. Violation of a Constitutional Right

### i. Substantive Due Process

EJS claims that McCloskey and the City violated its substantive due process rights. "In the zoning context, to state a claim of substantive due process, a plaintiff must establish: 1) the existence of a constitutionally protected property or liberty interest; and 2) deprivation of the constitutionally protected interest through arbitrary and capricious action." *E.g.*, *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir.2008).

---

[4] In *Pearson v. Callahan*, — U.S. —, 129 S.Ct. 808 (2009), the Court receded from its decision in *Saucier v. Katz*, 533 U.S. 194 (2001), in which it had held that a determination as to whether a constitutional violation had occurred was a mandatory first step in qualified immunity analysis. In *Pearson*, the Court, acknowledged that consideration of the constitutional question, while remaining often beneficial and appropriate, should "no longer be regarded as mandatory." — U.S. at —, 129 S.Ct. at 818. In this case, examination of the constitutional question first is appropriate.

EJS asserts it possessed a protected property interest in: 1) its Purchase Agreement with Pilkington to acquire the technical center building and adjacent land and its potential Lease Agreement with a charter school organization; and 2) the July 17, 2002, 7-0 vote by the Zoning and Planning Committee, to recommend that the Toledo City Council approve the re-zoning ordinance. EJS anticipated *pro forma* approval of the ordinance. According to EJS, the City Council's reversal of the Zoning and Planning Committee's July 17, 2002, recommendation that Council approve the re-zoning request was confiscatory. EJS also asserts a liberty interest to be free from the gross abuse of governmental power.

EJS argues that there are two types of substantive due process claims: one dependent on the assertion of a property interest, and the other based on governmental conduct that is arbitrary and capricious and shocks the conscience. According to EJS, while defendants respond to its substantive due process claim based on the asserted deprivation of property interests, defendants fail to respond to the claim insofar as EJS bases it on defendants' alleged arbitrary and capricious and conscience-shocking action.

Plaintiff's substantive due process claim fails as a matter of law because EJS cannot establish a protected property interest. The Constitution does not create property interests. Instead, property interests are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Rother*, 408 U.S. 564, 577 (1972). Thus, I must look to state law to determine whether EJS has a property interest in its Offer to Purchase and intended lease agreement and the vote taken by the Zoning and Planning Committee.

13

To have a property interest, a plaintiff must have more than a unilateral expectation of it. *R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 434 (6th Cir. 2005) ("[A] party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary") (citations omitted). Plaintiff must have a legitimate claim of entitlement or justifiable expectation of the asserted property interest. If the governing body has discretion to deny plaintiff's asserted property interest, then plaintiff has no legitimate claim of entitlement or reasonable expectation, and therefore no property interest. *See, e.g., Silver v. Franklin Tp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992) (holding that plaintiff had to "demonstrate a property interest in the use of the undeveloped parcel as a condominium complex;" to demonstrate this interest, plaintiff had to prove that the Zoning Appeals Board lacked "discretion to deny Silver's use of the land as a condominium complex if he complied with certain minimum, mandatory requirements."); *Triomphe Investors v. City of Northwood*, 49 F.3d 198, 202-03 (6th Cir. 1995) (substantive due process claim fails where plaintiff could demonstrate no property interest in special use permit "because City Council had discretion to grant or deny such a permit").

In this case, therefore, EJS must demonstrate that it had a legitimate claim of entitlement to or justifiable expectation of the proposed re-zoning ordinance and its purchase and lease agreement. EJS, however, cannot do so because the Toledo City Council had legislative discretion to deny the proposed ordinance. Toledo Municipal Code § 1111.01(a) states:

> (a) Council may, after public notice and hearings as provided in this section and after report by the City Plan Commission . . . amend, supplement or change the text or District Map herein or subsequently established.

Section § 713.10 of the Ohio Revised Code also grants city councils discretion to approve or deny ordinances for zoning changes, stating:

14

> The legislative authority of such municipal corporation may amend or change the number, shape, area, or [zoning] regulations of or within any district[.]

Finally, in *Wilson v. Trustees Union Twp.*, 1998 WL 744089, *4 (Ohio App. 1998), the court held:

> [O]ne who purchases property with knowledge of the current zoning restrictions may not challenge the constitutionality of the existing zoning [classification] merely because he may lose a more generous profit if a change in zoning is not made .  .  . Similarly, one who purchases property in the hopes of gambling on securing a change in zoning has no right to complain if the legislative body declines to rezone the property for the gambling buyer's benefit.

EJS argues that the City could identify no other instance in its history where a zoning matter received unanimous approval by the Plan Commission and the Zoning and Planning Committee and then suffered defeat by City Council. This evidence  however, does not suggest that Toledo City Council therefore lacked legislative discretion. Toledo City Council had legislative discretion to deny the re-zoning request; EJS, therefore, does not have a protectable property interest, and its substantive due process claim fails as a matter of law.

EJS argues that it also brings its substantive due process claim under an arbitrary and capricious or "shocks the conscience" standard. It cites *Pearson v. City of Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992), in which the Sixth Circuit held that "citizens have a substantive due process right not to be subjected to arbitrary or irrational zoning decisions."

In *Pearson*, *supra*, the Sixth Circuit did not eliminate the requirement of a property interest. It stated that "Fourteenth Amendment substantive due process requires that both state legislative and administrative actions that deprive the citizen of 'life, liberty or property' must have some rational basis." *Id.* at 1223. It noted that "federal court review of a zoning ordinance may only determine whether it is clearly arbitrary and unreasonable, in the very restricted sense that it has no substantial relation to the public, health, safety, morals or general welfare." *Id.*; *See, e.g.*, *Richardso*n *v.*

*Township of Brady*, 218 F.3d 508, 513, n.3. (6th Cir. 2000) (explaining that in its analysis of plaintiff's substantive due process claim it did not address whether plaintiff possessed a constitutionally-protected property interest because "neither party briefed this issue . . . the decision appealed from does not address this issue, and the substantive due process claims may be resolved on other grounds").

Even if EJS did assert a property interest, EJS does not establish that defendants acted in an arbitrary and capricious manner in voting against the passage of the re-zoning ordinance. To demonstrate that defendants acted in an arbitrary and capricious manner, EJS must allege sufficient facts to show that there exists no rational relationship between the vote against the re-zoning ordinance and a legitimate governmental purpose. EJS fails to do so here. The failure to pass the re-zoning ordinance was rationally related to legitimate governmental purposes: preserving large tracts of land for industrial, manufacturing or commercial use and developing an industrial corridor that included the Pilkington and Unicast properties.

Finally, the "shocks the conscience" standard applies to executive, not legislative action. *See, e.g., County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (executive actions are assessed under the "shocks the conscience"standard).

Because EJS cannot assert a protectable property interest, and fails to demonstrate that the defendants' action had no "substantial relation to the public, health, safety, morals or general welfare," EJS' § 1983 substantive due process claim fails as a matter of law. *See, e.g., Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. 2007) ("If there is no constitutional violation, then the plaintiff's § 1983 claim fails as a matter of law").

### ii. Procedural Due Process

16

As with substantive due process claims, to prevail on a procedural due process claim brought under § 1983, EJS must first allege the existence of a constitutionally-protected property interest. EJS has no such property interest because it has no legitimate claim of entitlement to the re-zoning ordinance, purchase or lease agreement. Because EJS has no protected property interest, due process protections are not triggered. *See, e.g.*, *Braun v. Ann Arbor Charter Township*, 519 F.3d 564, 573 (6th Cir. 2008) ("We are unable to find any cognizable property right that triggers due process protections. . . . In order to have a property interest in a benefit, a person must have more than a desire for it or unilateral expectation of it; rather, he must have a legitimate claim of entitlement to it."). As discussed in the foregoing analysis of EJS' substantive due process claim, the Toledo City Council had discretion to deny EJS' proposed re-zoning ordinance. Because the City possessed this discretion, EJS has no property interest, and its procedural due process claim against defendants fails as a matter of law. *Marvin, supra,* 509 F.3d at 244.

EJS argues that under *Hammond v. Baldwin*, 866 F.2d 172 (6th Cir. 1989), it may bring a procedural due process claim based on its submission to an unfair decision-making process. In *Hammond*, the Sixth Circuit stated,

> It is true that [s]ubmission to a fatally biased decision-making process is in itself a constitutional injury sufficient to warrant injunctive relief . . . . The injury is the submission itself; the biased (or potentially biased) decision may also result in injury, but it is a separate, distinct one. The administrative process requires the appearance of fairness and the absence of a probability of outside influences on the adjudicator; it does not require proof of actual partiality.

*Id*. at 176 (citations omitted).

According to EJS, having to submit to a decision-making process in which McCloskey had a pecuniary interest and attempted to influence other City Council members constituted a violation of procedural due process. Plaintiff's analysis of *Hammond,* and subsequent cases fails, however,

17

to recognize that courts inquire, for purposes of assessing justiciability under doctrines of finality, exhaustion and ripeness, whether plaintiff has submitted to a biased decision-making process. Submission to a fatally biased decision-making process is the injury, and courts do not have to wait for the outcome of the deficient process to review it.

The obligation to prove a cognizable and protectable property interest remains, and must be met, even in cases alleging governmental bias. *Clarkco Landfill Co. v. Clark County Solid Waste Management Dist.*, 110 F. Supp. 2d 627, 634-635 (S.D. Ohio 1999) (finding it unnecessary to address whether or not District's Directors were biased and prejudiced against siting a landfill on property because Plaintiff had not "alleged facts and circumstances" to establish that it had a "constitutionally protected property interest"); *see also, e.g., Bowers v. City of Flint,* 325 F.3d 758, 761 (6th Cir. 2003) (explaining that requirement of finality depends on the type of injury for which plaintiff is seeking redress, but not negating the property interest requirement); *Macene v. MJW, Inc.*, 951 F.2d 700, 706 (6th Cir. 1991) ("In this Circuit, then, a § 1983 plaintiff may prevail on a procedural due process claim by either (1) demonstrating that he is deprived of property as a result of established state procedure that itself violates due process rights; or (2) by proving that the defendants deprived him of property pursuant to a random and unauthorized act and that available state remedies would not adequately compensate for the loss.").

Because EJS has not alleged a property interest, due process protections are not triggered and its procedural due process claim fails as a matter of law. *See, supra, Marvin*, 509 F.3d at 244.[5]

---

[5] Due to delay in preparing a formal opinion and the imminence of the trial date, I informed counsel during a telephone conference on July 29, 2009, that I anticipated granting the City's motion for summary judgment, except with regard to plaintiff's claim of procedural due process. I stated that, if plaintiff could show that other members were aware of McCloskey's opposition to re-zoning prior to the crucial meeting, and, further, they were influenced to vote

### iii. Equal Protection

EJS also alleges a violation of equal protection against defendants under § 1983. According to EJS, the City and McCloskey unequally applied zoning laws in an arbitrary manner to discriminate against EJS.

Equal protection is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Living Ctr.*, 473 U.S. 432, 439 (1985). I must apply a "rational basis" review when no suspect classifications or fundamental rights are involved. *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000).

Under the rational basis review standard governmental policy has a "strong presumption of validity" and will be upheld "if there is a rational relationship between the disparity of treatment and some legitimate government purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The plaintiff must therefore negate "every conceivable basis which might support [the government's action] . . . Whether or not the basis has a foundation in the record." *Id.*

EJS asserts that Council's approval of re-zoning for the TPS middle school in January, 2004, following its August, 2002, denial of plaintiff's re-zoning request constituted an equal protection violation under the Fifth and Fourteenth Amendments. EJS argues that TPS and itself were "similarly situated" because both intended to use a portion of the 1701 East Broadway site for school classrooms and offices.

---

against re-zoning in light of McCloskey's anticipated opposition, his corrupt bias would have tainted the process – even though no other member knew about his corruption. In reaching that tentative conclusion, I had overlooked the predicate requirement that EJS had to have had a property interest before it could claim a violation of due process at the hands of a tainted decision-maker.

EJS, however, does not negate every conceivable basis supporting the City Council's action, and has not shown that TPS and itself were similarly situated. TPS, following the mandate of Toledo voters in November, 2002, that it build new middle schools in East Toledo, acquired the site by eminent domain. When the re-zoning request came to Council, TPS owned the property. EJS, in contrast had simply had a purchase contract contingent on favorable zoning.

Because TPS owned the property, it was lost to the City for future industrial purposes. Once TPS acquired the property, the City had no practical alternative to granting the necessary rezoning to enable its use for educational purposes.

TPS, furthermore,  intended to use the entire site. Unlike EJS, its plan did not involve "split zoning," and a large public middle school would not be subject to the kind of financial instability that a charter school might face.

Because EJS fails to show that EJS and TPS were similarly situated in all material respects, *cf. Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir.1992), plaintiff's equal protection claim under § 1983 fails as a matter of law. *See, supra, Marvin*, 509 F.3d at 244.

### iv. Access to Government to Petition for Redress of Grievances

EJS alleges defendants violated its First Amendment right to petition the government for redress of grievances. According to EJS, defendants prevented it from having "meaningful access" to City Council, and that "meaningful access" includes "the right to be free from governmental coercion, retaliation and corruption when one petitions the government." *Hampton Bays Connection, Inc. v. Duffy*, 127 F. Supp. 2d 364, 374 (E.D.N.Y. 2001).

Defendant City of Toledo argues that EJS has presented no evidence to show that it interfered with its right to petition the government. The City observes that EJS had and took advantage of multiple opportunities to petition the government.

The First Amendment guarantees the right to petition the government for the redress of grievances. U.S.Const. Amend. I. The right is broader than right of access to courts or other judicial forums, and extends to all departments of government. *See, e.g., Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Generally, the right to petition the government regarding a zoning decision is protected under the First Amendment. *See, e.g. White v. Lee*, 227 F.3d 1214, 1227 (9th Cir. 2000); *Hampton Bays Connections, Inc. v. Duffy*, 188 F. Supp. 2d 270, 280 (E.DN.Y. 2002).

EJS, however, fails to show that defendants violated its right to petition the government. "Nothing in the First Amendment or in . . . case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Minn. State Bd. for Community Colleges v. Knight*, 465 U.S. 271, 285 (1984).

In *White* the court held that plaintiffs exercised their First Amendment right to petition the government for redress of grievances by "attending and speaking out at zoning adjustment board hearings and by challenging in the courts the board's decision to grant a use permit." *Id*. at 1227. The court granted summary judgment to defendants finding that plaintiffs "were [not] prevented from making their case." *White, supra,* 227 F.3d at 1227.

In evaluating EJS' First Amendment claim, I need "only [be] concerned" with whether EJS "exercised [its] right to petition" the government, and whether the government "took any action that

21

might have chilled [plaintiff's] speech - not whether the City Council appropriately responded." *Erum v. County of Kauia*, 2008 WL 76321 (D. Hawaii) ("Individuals who attend and speak out at zoning board hearings as well as those who challenge the board's decisions, are exercising their First Amendment right to petition the government. The First Amendment is violated when a government acts to chill individuals' exercise of their First Amendment rights."); *Killay v. Giuliani*, 112 F. Supp. 2d 342, 354 (S.D.N.Y. 2000) ("The right to petition in general guarantees only that individuals have a right to communicate directly to government officials.").

Here, the City correctly points out that EJS initiated the request to change the zoning classification, participated in the Plan Commission's hearing on its application, participated in a public hearing on the re-zoning request, sent a letter arguing the merits to every City Council member and Mayor Ford and filed this cause of action. Defendants took no actions to impede EJS' right to petition the government for redress of grievances, and EJS provides no evidence that it did so. An unsatisfactory response from the City Council does not constitute a violation of its First Amendment right to petition the Government for redress of grievances.

## B. § 1983 Claims Fail as a Matter of Law

To bring a § 1983 challenge, a plaintiff must demonstrate a violation of plaintiff's constitutional rights. Because EJS has failed to allege that defendants violated its constitutional rights, its § 1983 claims against both McCloskey and the City of Toledo fail as a matter of law. No discussion of McCloskey or the City's entitlement to immunity on these claims is therefore necessary.[6] *See, supra, Marvin*, 509 F.3d at 244.

---

[6]EJS recently filed fact evidence and expert testimony to support its theory that the City had an informal custom and policy of "pay-for-play" and failed to train employees regarding the "bounds of propriety of such conduct and the means and obligations of reporting it." It argues

## II. Tortious Interference With a Business a Relationship

### 1. City of Toledo

EJS brings a state law claim against defendants for tortious interference with a business relationship. To state a claim for tortious interference with a business relationship, EJS must provide sufficient evidence to show: 1) a business relationship; 2) the tortfeasor's knowledge thereof; 3) an intentional interference causing a breach or termination of the relationship; and  4) damages resulting therefrom. *See Dolan, supra,* 173 Ohio App. 3d at 629.

The City of Toledo asserts immunity from EJS' state-law claim under O.R.C. § 2744. Section § 2744.02(A)(1) of the Revised Code establishes immunity for political subdivisions, such as municipalities. The City of Toledo is a "political subdivision" to which Ohio's statutory immunity applies. O.R.C. § 2744.01(F).

Section 2744 of the Revised Code divides the functions of political subdivisions into two categories: "governmental functions" and "proprietary functions." It provides that a political subdivision is not liable in damages for "injury, death or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental .   .   . function." *Spitzer v. Mid Continent Constr. Co., Inc.,* 2007 WL 3377212, *2 (Ohio App.).

Zoning matters are specifically identified as a type of "governmental function" to which immunity attaches. O.R.C. § 2744(C)(2)(p). The passage or non-passage of a zoning ordinance by the political subdivision's legislative body is a governmental function. *See, e.g., Helfrich v. City of*

---

the evidence entitles EJS to a jury determination of the City's liability under § 1983. The evidence, however, does not help EJS establish a cognizable property interest, so that it suffered violations of its constitutional rights. [Doc. 334].

*Pataskala*, 2003 WL 49030, at *3 (Ohio App. Ct. 2003) ("appellees were political subdivisions engaged in a governmental function when appellant's applications to build on his property were considered and denied.").

O.R.C. § 2744.02(B) sets forth five exceptions to political-subdivision immunity, none of which apply here. There is no exception recognized for intentional torts. *See, e.g., Ziegler v. Mahoning Cty. Sheriff's Dept.*, 137 Ohio App.3d 831, 836 (2000) (§ 2744.02(B) "contains no specific exceptions for intentional torts and an intentional tort occurs outside of the employment relationship.").

I therefore grant summary judgment to the City of Toledo on plaintiff's state law claim.

### 2. Robert McCloskey

EJS also alleges that McCloskey committed tortious interference with its business relationship.

I deny McCloskey summary judgment on this claim. EJS presents evidence to show: 1) the existence of a business relationship between itself and Pilkington; 2) McCloskey's knowledge of the relationship; 3) intentional interference causing a breach or termination of the relationship; and 4) damages resulting therefrom. *See, e.g., Dolan, supra,* 173 Ohio App.3d at 630 (2007) (citation omitted).

Under Ohio law, a municipal employee, like a city council person, may be liable for business torts. *Id.* O.R.C. § 2744.02(A)(6) governs whether a municipal employee enjoys qualified immunity for its conduct. An employee does not enjoy immunity if his alleged acts or omissions were manifestly outside the scope of his employment, or were with malicious purpose, in bad faith or in a wanton or reckless manner. O.R.C. § 2744.03(A)(6)(a)-(b). EJS proffers evidence that

McCloskey's actions were outside of the scope of his employment, and were taken in bad faith. McCloskey, therefore, is not entitled to qualified immunity on this claim.

EJS has demonstrated that McCloskey knew of the business relationship it had with Pilkington and intentionally interfered and caused the termination of the relationship. McCloskey attended the hearings before the Planning Commission and Zoning and Planning Committee. Initially, McCloskey favored the proposed re-zoning ordinance, and voted in its favor at the July 17, 2002, meeting of the Zoning and Planning Committee. After plaintiff rejected his monetary demand, however, he vocally opposed the re-zoning ordinance and voted against it. The *Toledo Blade* reported that the day after the vote denying the re-zoning ordinance, McCloskey admitted he had "a little bit of revenge in [his] stomach" against Pilkington. Some members of City Council have testified that McCloskey spoke with them about his desire that the re-zoning ordinance be rejected. EJS also maintains some Councilpersons knew that McCloskey changed his vote because of Pilkington's failure to accede to his monetary demand. City Council members also testified that it is common to consult with the district representative regarding a matter that would affect that representative's district.

Because the City Council failed to approve the re-zoning ordinance, EJS lost its contract with Pilkington to purchase the Pilkington property, its potential lease agreement with Lake Erie Academy for part of the technical center and its rights to lease other portions of the property to prospective lessees.

There does therefore exist a genuine issue of material fact as to whether or not McCloskey tortiously interfered with plaintiff's business relationship with Pilkington. I deny summary judgment to McCloskey on this claim.

**Conclusion**

For the foregoing reasons, it is hereby:

ORDERED THAT

1. Defendant Robert McCloskey's motion for summary judgment [Doc. 219] be, and the same hereby is granted as to plaintiff's § 1983 claims, and denied on plaintiff's claim for tortious interference with business relationships;

2. Defendant City of Toledo's motion for summary judgment [Doc. 221] be, and the same hereby is granted.

3.  A pretrial conference is scheduled for September 1, 2009 at 11:30 a.m.  Counsel shall call the bridge line at 419-213-5509, access code 550911.

So ordered.


s/James G. Carr
James G. Carr
Chief Judge